**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

COMMONWEALTH OF PENNSYLVANIA : IN THE SUPERIOR COURT OF
:                 PENNSYLVANIA
:
v.                                      :
:
:
MALIK ANDERSON                          :
:
Appellant          :      No. 1645 EDA 2020

Appeal from the PCRA Order Entered August 3, 2020
In the Court of Common Pleas of Philadelphia County
Criminal Division at No(s):  CP-51-CR-0011782-2013

BEFORE:   PANELLA, P.J., KUNSELMAN, J., and STEVENS, P.J.E.[*]

MEMORANDUM BY PANELLA, P.J.:                   **FILED JANUARY 28, 2022**

Malik Anderson appeals from the Philadelphia Court of Common Pleas'

order dismissing his first petition filed pursuant to the Post Conviction Relief

Act ("PCRA"), 42 Pa. C.S.A. §§ 9541-9546, without holding an evidentiary

hearing. In his petition, Anderson raised multiple claims of counsel's

ineffectiveness. Those claims included Anderson's allegation that trial counsel

had been ineffective for failing to seek suppression of the derivative evidence

obtained from an initial statement Anderson made to police during the

investigation of the murder of Daquan Crump, a crime for which Anderson was

later convicted. Counsel did file a motion to suppress the statement itself, but

the trial court denied that motion. On direct appeal, this Court determined

---

[*] Former Justice specially assigned to the Superior Court.

that the court erred by failing to suppress Anderson's initial statement because it had been a product of an unconstitutional interrogation, but we also concluded that no relief was due because the error had been harmless.

Anderson now asserts that counsel should have also filed a motion to suppress all derivative evidence obtained from that initial statement as it "led to the bulk of the evidence the Commonwealth presented at trial." Commonwealth's Brief at 43. The Commonwealth concedes that this ineffectiveness claim is "most problematic" and asks this Court to remand to the PCRA court to hold an evidentiary hearing on the claim. Commonwealth's Brief at 3. We agree that Anderson is entitled to an evidentiary hearing on this issue, and therefore reverse that part of the PCRA court's order dismissing this claim without a hearing. However, we also agree with the Commonwealth and the PCRA court that the remainder of Anderson's ineffectiveness claims lack merit and therefore affirm that portion of the PCRA court's order dismissing those claims.

In order to fully understand Anderson's first ineffectiveness claim, and why it requires a remand for a hearing, a detailed recitation of both the facts and the procedural history of this case is necessary. On August 19, 2013, construction workers discovered Crump's body at a construction site in Northeast Philadelphia ("the construction site"). Crump had been shot multiple times in the head.

Police spoke to Crump's sister on August 20, 2013. She told them that "Quil Banga," later determined to be Sirrieah-Mean Jharquil, had been threatening Crump on Facebook. She also told police she had called a number her brother often used to contact her, and that person, later determined to be Anderson, told Crump's sister that he had been with Crump the night before his murder (August 18, 2013) and had last seen him around midnight. The police suspected Jharquil of Crump's murder but wanted to speak with Anderson in connection with the shooting.

Philadelphia Police Detective James Griffin asked Anderson to come to the station, and Anderson's parents took Anderson to the police station around 12:20 p.m. on August 20, 2013, for what Detective Griffin described as an "informal interview." N.T. Motion Volume I, 10/6/14, at 11. Anderson was the first person to be interviewed in connection with the murder. Detectives Griffin and Henry Glenn did not read Anderson his *Miranda*[1] rights, but they did keep and question him for more than 30 hours. During that time, Anderson's parents retained an attorney, who contacted the police station as well as Detective Griffin directly. Detective Griffin, however, did not relay the information to Anderson that his parents had retained an attorney because, according to Detective Griffin, Anderson never asked for an attorney.

---

[1] *See Miranda v. Arizona*, 384 U.S. 436 (1966).

During the questioning, Anderson gave information to the detectives and eventually signed a statement. Anderson denied any involvement in the murder. He told the detectives that he and Crump, who Anderson identified as his best friend, were hanging out with three of their friends at Anderson's house on the evening of August 18, 2013. Anderson identified those friends as James Thompson, Ryan Farrell and Darrell Holmes.

According to Anderson, Crump announced to the group that he was going to Frankford, and Anderson, Thompson, Holmes and Farrell then got in Farrell's car and went to Farrell's house. Anderson claimed he last saw Crump around midnight, standing outside of Anderson's house. Sometime around three a.m., Anderson said, he received a call from his parents to come home, and he and Thompson left Farrell's house to walk back to Anderson's house. Anderson took a shortcut through the construction site while Thompson took a longer route. Anderson stated that once they got back to Anderson's house, the two of them went to sleep. Anderson also told the detectives about the dispute Crump had with Jharquil, and the threats Jharquil had made to Crump on Facebook.

Based on this information from Anderson, the detectives obtained photos of Farrell, Thompson and Holmes. Anderson helped the detectives find Thompson's photo on Facebook. Police then interviewed Farrell and Holmes separately at the police station on August 21, 2013, and both gave statements with a narrative similar to Anderson's. They stated that they had last seen

Crump around midnight at Anderson's house on August 19, 2013. Neither implicated Anderson in the murder.

Police released Anderson around 8:40 p.m. on August 21, 2013, more than 30 hours after they brought him in for questioning. Anderson met with his attorney the following day, August 22, 2013. Anderson's attorney repeatedly told Anderson not to say anything to police about the shooting unless he was present.

Meanwhile, also on August 22, 2013, Detectives Ohmarr Jenkins and Fred Mole interviewed Jharquil who told police that he had last seen Crump in July of 2013 when they had a dispute over missing jeans. He also told the detectives that Anderson had shown him a .22 caliber gun in May of 2013. Jharquil maintained that he had been at his mother's office at the time Crump was shot. Police were able to confirm this alibi and therefore excluded Jharquil as a suspect.

On August 23, 2013, Detective Gregory Santamala prepared an affidavit of probable cause for a warrant to search Anderson's house. A search warrant was issued that same day, and at approximately 2:45 p.m., Detective Santamala went to Anderson's house to conduct the search. As Detective Santamala was beginning the search, he received a call from Detective Edward Tolliver. Detective Tolliver told Detective Santamala to look for a gun in a waffle box in the kitchen freezer based on information he had just learned during an interview with Thompson.

Detective Tolliver had picked Thompson up to question him on August 22, 2013, but because Thompson was under the influence of drugs, detectives were not able to interview Thompson at that time. Police kept Thompson overnight and Detectives Tolliver and Charles Grebloski began interviewing Thompson at approximately 2:15 p.m. on August 23, 2013. During that interview, Thompson ultimately gave a statement implicating Anderson in Crump's murder. Thompson told the detectives that Crump had actually gone with the group from Anderson's house to Farrell's house in the early morning hours of August 19, 2013.

Thompson said that at around five a.m., he, Anderson and Crump left Farrell's house to go back to Anderson's house. However, Thompson stated that he did not want to take the shortcut to Anderson's house through the construction site, so he took a longer route to Anderson's house, while Anderson and Crump took the shortcut. According to Thompson, he heard gunshots coming from the construction site and Anderson arrived home without Crump. He and Anderson then went to sleep.

Thompson recounted that later in the morning on August 19, 2013, Anderson told him that he had shot and killed Crump. Thompson stated that he saw Anderson with a black .22 caliber gun, which Anderson hid in a crate in the basement of Thompson's girlfriend's neighbor's house. Thompson then told the detectives that a day or two later, Anderson showed Thompson an Eggo waffle box while they were in Farrell's basement and told Thompson he

was going to hide the gun in the box in his kitchen freezer until he could bury the gun.

Based on this information, Detective Tolliver called Detective Santamala and told him to look for that waffle box in Anderson's kitchen freezer. Detective Santamala searched the freezer, and he found a family pack Eggo waffle box inside the freezer in the bottom of a freezer drawer. He picked up the box, turned it, and saw an undershirt sticking out from the box. Inside the box, wrapped in the undershirt, was a black .22 caliber gun. The gun was later determined to be the murder weapon.

Detectives then re-interviewed Farrell on August 23, 2013 and Holmes on August 24, 2013. Farrell changed his version of events from the one he had given in his first statement. Specifically, Farrell stated that the group had not separated from Crump in the early morning hours of August 19, 2013, as he had previously maintained, but that Crump had actually come to Farrell's house with the rest of the group. Sometime between three and five a.m. on August 19, 2013, Anderson, Thompson and Crump left Farrell's house for Anderson's house. Farrell recounted that Anderson later confessed to shooting Crump and that Anderson subsequently met with Farrell, Thompson and Holmes to make sure that their stories all aligned.

Holmes also implicated Anderson in his second statement. Holmes stated that, contrary to his first statement, Crump did go to Farrell's house with the group and that it was at Farrell's house, not Anderson's house, where

Holmes last saw Crump. According to Holmes, Anderson told Holmes on August 19, 2013, to say that he last saw Crump at Anderson's house around midnight. Holmes said he had seen Anderson with a .22 Ruger gun, and he saw that gun in a duffel bag Anderson was carrying the day after the shooting.

Detective Griffin arrested Anderson on August 28, 2013. According to Detective Griffin, he read Anderson his **Miranda** rights and Anderson waived his rights. Anderson then signed a second statement. In this statement, Anderson shared that he and Crump "hung out all day Sunday and smoked weed and drank at my house." Investigation Interview Record of Malik Anderson, 8/28/13, at 2. He conceded that Crump had gone to Farrell's house with the group and that "[e]arly Monday morning" he and Crump left Farrell's house. *Id.* He stated that he had been angry at Crump for single-handedly stealing and selling a game system from Farrell that he and Crump had planned on stealing and selling together. He confessed to shooting Crump in the construction site, admitting that he "stood over him and pulled the trigger and shot him in the face until the gun stopped." *Id.* Anderson was charged with, *inter alia*, first-degree murder.

The Commonwealth later offered Anderson a plea with a recommended sentence of 32 to 64 years in exchange for a guilty plea to third-degree murder, a firearms offense, conspiracy to commit burglary and false reports to police. Following two separate colloquies, Anderson rejected the plea and expressed his desire to go to trial.

Counsel filed a motion to suppress both of Anderson's statements to the police, and the court held a hearing on the suppression motion.[2] Detective Griffin and Anderson both testified and gave vastly different accounts of what occurred prior to the recitation of each statement. As for the first statement, Anderson testified that he was held for over 30 hours at the station but was not offered any food or given the opportunity to sleep during that time. Detective Griffin denied this. As for the second statement, Anderson said he never gave or signed a statement, was never *Mirandized* and per his very specific instructions by his lawyer, repeatedly asked for his lawyer.

The trial court denied the motion to suppress, and the case proceeded to trial.[3] A jury found Anderson guilty of first-degree murder, possession of an instrument of crime and firearms not to be carried without a license. The court immediately sentenced Anderson to the mandatory term of life imprisonment

---

[2] In the motion, counsel also generally sought to suppress all physical evidence seized by law enforcement. *See* Omnibus Pre-trial Motion General Allegations, 10/14/13, at 1-2 (unpaginated). However, counsel did not argue for that during the hearing, instead limiting his argument to the suppression of the statements. *See* N.T., Motion Volume I, 10/6/14, at 3.

[3] During trial, counsel raised the issue that the suppression of the physical evidence aspect of the suppression motion remained outstanding, though counsel conceded that he had not really argued that during the suppression hearing. *See* N.T. Trial, 10/10/14, at 73-74 ("I don't recall you ruling on my four corners motion with regard to physical evidence only"). The trial court agreed that "there was really no argument made" on the suppression of the physical evidence, but denied the motion on the record. *Id.* This discussion clearly references the written motion's arguments regarding the search warrant for Anderson's home and not any request for suppression of any derivative physical evidence based on the unconstitutional interrogation.

for the first-degree murder conviction, and gave lesser sentences, to run concurrently on the remaining convictions.

Anderson filed a notice of appeal with this Court, but that appeal was quashed as untimely. Anderson's appellate rights were subsequently reinstated *nunc pro tunc,* and Anderson again filed a notice of appeal with this Court. In considering his appeal, we agreed with Anderson that the trial court had erred by not granting his motion to suppress his initial statement to police because it had been the product of a coercive custodial interrogation and Anderson had not been read his **Miranda** rights. **See Commonwealth v. Anderson**, 425 EDA 2018, 2019 WL 6911357, at *6 (Pa. Super. 2019) (non-precedential decision). The Court, however, found that the error had been harmless and did not warrant any relief because the first statement given by Farrell to police, which had properly been admitted at trial, "contained substantially similar information" as that contained in Anderson's initial statement. **Id.** We rejected Anderson's remaining claims, and affirmed Anderson's judgment of sentence. Our Supreme Court denied Anderson's petition for allowance of appeal.

Anderson filed a timely *pro se* PCRA petition, raising 12 claims of ineffectiveness of counsel. Appointed counsel filed a **Finley/Turner**[4] no-merit

---

[4] **See Commonwealth v. Finley**, 550 A.2d 213 (Pa. Super. 1988) (*en banc*) and **Commonwealth v. Turner**, 544 A.2d 927 (Pa. 1988).

letter and an application to withdraw from representation. Anderson filed an opposition to the **Finley/Turner** letter, followed by two *pro se* supplemental PCRA petitions raising additional ineffectiveness claims. The PCRA court filed a Pa.R.Crim.P. 907 notice of its intent to dismiss the PCRA petition without a hearing. On March 10, 2020, Anderson filed a response to the Rule 907 notice, as well as a request for an evidentiary hearing on his ineffectiveness claims. Shortly thereafter, the courts closed due to the COVID-19 pandemic, and it was therefore not until August 3, 2020 that the PCRA court entered an order dismissing Anderson's PCRA petition.[5]

Anderson filed a *pro se* notice of appeal, followed by several applications seeking to proceed *pro se* on appeal. This Court eventually remanded for a **Grazier**[6] hearing, **see** *Per Curiam* Order, 1/19/21 (single page), and the PCRA court held a hearing and entered an order granting Anderson's request to

---

[5] Although counsel filed a **Finley/Turner** letter and an application to withdraw from representation, there is no order disposing of that application by the PCRA court. Indeed, appointed PCRA counsel filed an application to withdraw with this Court, stating that although the "PCRA court accepted the **Finley** letter … an order granting [the application to withdraw] was not entered on the [PCRA court's] docket at the time of PCRA dismissal." Motion to Withdraw as Counsel, 9/17/20, at 1. He urged this Court to grant the motion given that Anderson has filed all filings as *pro se* since the dismissal of the PCRA petition. **See id.** at 2. This Court denied the application to withdraw "without prejudice to Appellant's right to apply to the PCRA court for the requested relief." **See** *Per Curiam* Order, 10/26/20 (single page).

[6] **See Commonwealth v. Grazier**, 713 A.2d 81 (Pa. 1998).

proceed *pro se* on April 8, 2021. Anderson then filed his *pro se* brief with this Court, claiming that the PCRA court erred by rejecting his claims of ineffectiveness and dismissing his petition without a hearing.

Our review of an order dismissing a PCRA petition is limited to examining whether the PCRA court's determinations are supported by the record and the court's decision is free of legal error. *See Commonwealth v. Shaw*, 217 A.3d 265, 269 (Pa. Super. 2019). Although we give great deference to the factual findings of the PCRA court and will not disturb those findings unless they have no support in the record, we apply a *de novo* standard of review to the PCRA court's legal conclusions. *See Commonwealth v. Benner,* 147 A.3d 915, 919 (Pa. Super. 2016).

Further, the PCRA court is not required to hold an evidentiary hearing prior to dismissing a petition as a petitioner is not entitled to a PCRA hearing as a matter of right. *See Shaw,* 217 A.3d at 269. The PCRA court can decline to hold a hearing if there is "no genuine issue concerning any material fact, the petitioner is not entitled to PCRA relief, and no purpose would be served by any further proceedings." *Id*. This Court is therefore tasked on appeal with examining each challenged issue to determine whether the PCRA court erred in its conclusion that there were no genuine issues of material fact in controversy and in denying relief without conducting a hearing. *See Commonwealth v. Miller,* 102 A.3d 988, 992 (Pa. Super. 2014).

Anderson raises multiple claims challenging trial counsel's ineffectiveness. Counsel is presumed to have been effective. *See* ***Commonwealth v. Brooks***, 839 A.2d 245, 248 (Pa. 2003). In order to overcome that presumption and prevail on a claim of ineffectiveness, Anderson must establish that: (1) the underlying claim has arguable merit; (2) counsel had no reasonable basis for his conduct; and (3) he was prejudiced by counsel's ineffectiveness, *i.e.* there is a reasonable probability that because of the act or omission in question, the outcome of the proceeding would have been different. ***See id***.

As noted above, Anderson's first claim alleges that trial counsel was ineffective for failing to file a motion to suppress the evidence the police derived from his initial statement to police, which this Court has confirmed was illegally obtained. Specifically, Anderson argues this claim has arguable merit as there was clearly significant evidence acquired from the illegally-obtained statement. ***See Commonwealth v. Santiago***, 209 A.3d 912, 924 (Pa. 2019) (stating that the general exclusionary rule, which requires exclusion of all evidence unlawfully obtained, extends to the indirect and direct products of the illegality under the fruit of the poisonous tree doctrine). He further avers that counsel could not possibly have had a reasonable basis for failing to seek to suppress this evidence as it made up much of the Commonwealth's case against him, and that the prejudice from this failure is clear.

In response, the Commonwealth concedes that Anderson is entitled to a PCRA hearing on this claim, which it describes in the following way:

> [Anderson] argues that because he was the first person of interest the police interviewed, but for his illegally obtained statement the police would not have been led to the bulk of the evidence the Commonwealth presented at trial. [*See*] Brief for Appellant [at] 29. [Anderson] lists the pieces of evidence he claims are fruits of the poisonous tree, including the identities of Farrell, Holmes, Thompson, and Jharquil, whose interviews formed the basis for probable cause for the search warrant, which led to the discovery of the murder weapon, which in turn led to [Anderson's] arrest and his eventual allegedly false confession. [*See] id.* at 29. Counsel did not seek suppression of *all* of the evidence derived from [Anderson's] custodial interrogation. [*See*] Omnibus Pre-Trial Motion, 10/14/13, 1-3 (unpaginated).

Commonwealth's Brief at 43 (emphasis in original).

The Commonwealth, in effect, recognizes that counsel should have done so. However, the Commonwealth essentially argues that, even had the more comprehensive suppression motion been filed, it may not have garnered relief as the Commonwealth may have presented evidence that it had an independent source, outside of Anderson's statement, for the information derived from Anderson's illegally-obtained statement. To that end, the Commonwealth states:

> The record does not reflect whether police had an independent source for the information [Anderson] now claims counsel should have moved to suppress. *See* [ ] *Santiago*, 209 A.3d [at] 923 [ ] (*citing* **Nix v. Williams**, 467 U.S. 431, 442-443 (1984) for the proposition that the independent source and inevitable discovery doctrine purges the taint of illegally obtained evidence). Of particular concern is whether Thompson's only statement incriminating [Anderson] and informing detectives where to find the gun, and Farrell['s] and Holmes'[s] second statements, were fruit of the poisonous tree. The evidence [Anderson] claims should

- 14 -

have been suppressed includes much of the evidence the Commonwealth presented at trial.

Commonwealth's Brief at 43-44. "Because much of the Commonwealth's trial evidence is at issue", the Commonwealth asks this Court to remand for an evidentiary hearing on this issue. *See id.* at 45.

We agree that an evidentiary hearing is warranted. At this juncture, we are unable to say that there is no genuine issue of material fact regarding this claim or that Anderson is not entitled to relief on the basis of counsel's failure to seek a motion to suppress the derivative evidence obtained from the unconstitutionally-coerced statement. A hearing will provide a forum to answer these questions, and therefore there is a clear purpose to be served by such further proceedings. *See Shaw,* 217 A.3d at 269.

We note that the PCRA court did not address this specific claim in its opinion. Rather, the PCRA court rejected Anderson's suppression claim on the basis that counsel did, in fact, file a motion to suppress. While there is no dispute that counsel filed a motion to suppress, that motion sought suppression of the statements Anderson gave to police. It also sought, in a separate heading, suppression of the evidence seized from Anderson's house based on an argument that the search warrant was defective.

The omnibus pre-trial motion did not seek suppression of the substantial evidence the police derived from Anderson's initial and unconstitutional statement he gave to police, which is what forms the basis of Anderson's

particular claim of ineffectiveness here.[7] In the end, we agree with the Commonwealth that the factual and procedural landscape of this case, detailed above, leaves open the question of whether counsel was ineffective for failing to seek suppression of the fruit derived from Anderson's initial and unconstitutional statement to police. We therefore reverse the part of the PCRA court's order dismissing this claim without a hearing, and remand to the PCRA court to hold such a hearing.

We must now turn to the five other ineffectiveness claims raised by Anderson to determine whether those claims merit any relief. Anderson essentially argues in his second claim that counsel was ineffective for allowing Anderson to reject the Commonwealth's plea offer with a recommended sentence of 32 to 64 years before ensuring that Anderson was aware that he would receive a mandatory sentence of life imprisonment should he proceed to trial and be convicted of first-degree murder. Anderson insists he would have accepted the plea if he understood this. This claim fails.

---

[7] The PCRA court also noted that, in addition to its belief that counsel had already litigated this claim, this Court had previously reviewed this issue and found that although Anderson's statement had been unconstitutionally obtained, the error was harmless because Farrell's initial statement contained substantially similar information. However, Anderson's claim here is essentially that police learned of Farrell's identity through Anderson's initial, unconstitutionally-obtained statement, which led to the police interviewing Farrell and ultimately obtaining his statement. To be sure, Detective Griffin explicitly stated that "we did not know of [Farrell] … until we spoke to [ ] Anderson." **See** N.T. Motion Volume I, 10/6/14, at 47-48.

Counsel has a duty to communicate and explain the advantages and disadvantages of a plea offer to his client. **See Commonwealth v. Martinez**, 777 A.2d 1121, 1124 (Pa. Super. 2001). "Failure to do so may be considered ineffectiveness of counsel if the defendant is sentenced to a longer prison term than the term he would have accepted under the plea bargain." **Id**. In order to obtain relief, a petitioner must show that the ineffective assistance of counsel caused him to reject the plea. **See Commonwealth v. Steckley**, 128 A.3d 826, 832 (Pa. Super. 2015).

Here, the Commonwealth offered Anderson a recommended sentence of 32 to 64 years in exchange for a guilty plea to third-degree murder, a firearms offense, conspiracy to commit burglary, and false reports to police. The court colloquied Anderson twice regarding his decision on whether or not to accept the guilty plea. The court held the first plea colloquy on September 23, 2014.[8] At that colloquy, the following exchange took place:

> **THE COURT:** The charges against you are what we refer to as murder generally, which would include first-degree murder, and certain gun charges. If you go to trial and are convicted of first-degree murder, the mandatory sentence is life in prison. Do you understand that?

---

[8] The notes of testimony from the September 23, 2014 colloquy were not in the certified record. All appellants, even those proceeding *pro se*, are responsible for making sure the record forwarded to this Court contains that which is needed for the Court to properly review any particular claim brought by the appellant. **See Commonwealth v. Shreffler**, 249 A.3d 575, 584 (Pa. Super. 2021). Notwithstanding Anderson's failure to do so here, upon informal inquiry, our Prothonotary was able to secure the notes of testimony and include them in the record, enabling us to undertake a more complete assessment of this claim.

**[ANDERSON]:** Yes, sir.

**THE COURT:** There can be no other sentence. It's life in prison without parole. Do you understand that, sir?

**[ANDERSON]:** Yes, sir.

N.T. Hearing, 9/23/14, at 5. The court then went on to explain the plea that the Commonwealth had offered him, including the recommended sentence of 32 to 64 years, and Anderson acknowledged that those terms had been explained to him. *See id.* at 5-6. Anderson rejected the offer at that time. The court, however, gave him additional time to consider the plea.

This exchange in and of itself shows that Anderson was made aware that, should he go to trial and be convicted of first-degree murder, he would face a mandatory sentence of life imprisonment. His claim fails for that reason alone.

However, counsel's involvement in making sure Anderson understood the terms of the plea and the consequences of not accepting that plea did not end there. Following this colloquy, on October 1, 2014, counsel sent Anderson a letter memorializing what Anderson and his family had discussed regarding the plea given the "serious ramifications involved" in this case. Attorney/Client Correspondence, 10/1/14, at 1 (unpaginated). The letter, in no uncertain terms, urged Anderson to accept the plea. The letter recounted the incriminating evidence the Commonwealth had against Anderson, including his confession, his admission to his friends that he had killed Crump, and the

fact that the murder weapon was found in his freezer. ***See id***. at 1-2. It was, counsel admitted, the "most difficult set of facts [he had] ever been given." ***Id.*** at 2. Counsel predicted that if Anderson went to trial, he would be convicted of murder in the first degree and he therefore implored him to accept the plea offer. ***Id.*** at 2. The letter stated:

> Obviously, none of this is new news to you, as I have explained this all to you in person, which you readily rejected. I am hoping that perhaps if you see it in black and white, you will see how difficult a task you have been given… I do care about my clients, especially at the tender age of 19.

***Id.*** at 2.

Anderson then appeared in court on October 6, 2014, and the court held a second plea colloquy. In that colloquy, the court recounted how it had previously discussed with Anderson the terms and the recommended sentence of the Commonwealth's plea, and that Anderson had rejected the plea at that time. ***See*** N.T. Trial, 10/6/14, at 5-6. The court stated that it was its understanding that Anderson had again discussed the plea with counsel and family as recently as that morning. Anderson acknowledged that he had the opportunity to discuss the plea with his family and counsel, but that he still did not want to accept the plea. ***See id.*** at 6.

Based on all of the above, it is clear that counsel was not ineffective for failing to ensure Anderson was aware that he faced a mandatory sentence of life if he proceeded to trial and in turn, that the Commonwealth's plea offered

a lesser sentence than life. Anderson's acknowledgement that he understood this is on the record.

Anderson asserts in his next claim that counsel was ineffective for urging Anderson to take the plea because it included charges that were not included in the bill of information. Specifically, Anderson notes that the plea agreement would have required him to plead guilty to conspiracy to commit burglary and false reports to the police, and neither of these charges were included in the bill of information.[9] He appears to argue that the inclusion of these charges in the plea confused him, counsel did not clarify the matter for him, and this confusion caused him to reject the plea. This claim fails.

The prosecutor has the power to select the criminal charges to be filed against a defendant and to negotiate plea bargains. ***See Commonwealth v. Cosby***, 252 A.3d 1092, 1131 (Pa. 2021). As for the propriety of the terms of a plea agreement, we have stated:

> The terms of plea agreements are not limited to the withdrawal of charges, or the length of a sentence. Parties may agree to - and seek enforcement of - terms that fall outside these areas. Moreover, even though a plea agreement arises in a criminal context, it remains contractual in nature and is to be analyzed under contract law standards.

***Commonwealth v. Hainesworth***, 82 A.3d 444, 449 (Pa. Super. 2013) (internal citation omitted). Of course, unlike a typical contract, a plea

---

[9] In addition to murder, Anderson was charged with firearms not to be carried without a license, possession of a firearm prohibited, and possession of an instrument of crime.

agreement consented to by the parties does not become binding and valid until accepted by the trial court. *See Commonwealth v. Martinez,* 147 A.3d 517.

Here, Anderson does not allege that the trial court would not have accepted the plea offered to him if Anderson himself had first chosen to accept it. In fact, in rejecting this claim below, the PCRA court stated:

> It is clear to this court that [Anderson] was not given additional charges in his plea agreement. Instead, the plea agreement replaced charges, such as replacing first-degree murder with third[-]degree murder. The number of charges remained the same: the only difference was the severity of some of the charges. The most significant change was that the plea involved third-degree murder, not first-degree murder, meaning that [Anderson] did not automatically face life imprisonment and instead faced an aggregate term of [32 to 64] years for those charges. Any claim that [Anderson's] attorney negotiated for additional or illegal charges is incorrect.

PCRA Court Opinion, 10/22/20, at 15.

We see no error in the court's conclusion that counsel was not ineffective for advocating that Anderson take a plea that included lesser charges than those included in his bill of information. We note that Anderson does not cite to any case supporting his assertion that the plea offer was invalid because it included uncharged but lesser offenses than the ones he had been charged with in the bill of information. As the Commonwealth points out, the bill of information could have been amended to include the lesser charges. Moreover, again as the Commonwealth points out, the facts of this case "were sufficient to support the offenses offered in the plea, meaning the plea was

valid." Commonwealth's Brief at 51; *see Commonwealth v. Vaughn*, 326 A.2d 393, 394 (Pa. 1974) (holding that a guilty plea should not be accepted if the facts of the case do not support the plea). Anderson does not dispute this.

We also add that while counsel absolutely has a duty to explain the terms of a plea offer to the client, if the client is confused by those terms, as Anderson suggests he was here, it is incumbent upon the client to ask for further clarification. That way, counsel has the opportunity to try to explain the terms of a plea offer in a way the client better understands. Although Anderson now seems to claim he was confused by the plea offer, he does not allege that he asked counsel to try to defuse that confusion or that counsel refused to do so. No relief is due on this claim.

Next, Anderson claims counsel was ineffective for failing to object to five statements the prosecutor made during closing arguments. Although the PCRA court did not specifically address each individual statement Anderson challenges, the court did conclude in its opinion that Anderson was not entitled to any relief on the basis of his claim of prosecutorial misconduct. We see no error in that conclusion.

A prosecutor's comments constitute reversible error only "where their unavoidable effect is to prejudice the jury, forming in their minds a fixed bias and hostility toward the defendant such that [the jury] could not weigh the evidence objectively and render a fair verdict." *Commonwealth v. Tedford*, 960 A.2d 1, 33 (Pa. 2008) (citation omitted). A prosecutor is permitted to

respond to arguments made by the defense. ***See id.*** Therefore, if defense counsel attacks the credibility of a witness, the prosecutor may respond to counsel's argument and address the credibility of the witness. ***See Commonwealth v. Judy,*** 978 A.2d 1015, 1020 (Pa. Super. 2009). Moreover, comments based on the evidence, or proper inferences derived from that evidence, or ones that amount to mere oratorical flair, do not amount to prosecutorial misconduct. ***See Tedford***, 960 A.2d at 33. Any prejudice stemming from a prosecutor's factual misstatement during closing arguments may be cured by the court's instruction that the attorneys' arguments are not evidence and the jury is the sole fact-finder. ***See Commonwealth v. Simmons***, 662 A.2d 621, 639-640 (Pa. 1995)

The first prosecutorial statement Anderson challenges is "James Thompson, you had to love James Thompson. He was the most credible witness in this case." N.T. Trial, 10/15/14, at 62. Anderson complains that this statement amounted to improper witness bolstering in violation of the ABA Standards for Prosecutors. However, we agree with the Commonwealth that the statement was not improper as defense counsel questioned Thompson's credibility during his closing argument, ***see*** N.T., 10/15/14, 52-54, and Anderson fails to show that the challenged statement was not a fair response to defense counsel's argument in that regard. ***See Judy***, 978 A.2d at 1020. As a result, Anderson has not demonstrated that counsel was ineffective for failing to object to this statement.

Next, Anderson asserts that counsel was ineffective for failing to object when the prosecutor argued to the jury that the murder was a "gruesome thing. Daquan Crump is shot in the head ten times. He's left to die in that construction site like a dog" and Anderson "let his friend die like a dog over $60." N.T. Trial, 10/15/14, at 64-65, 71. Anderson complains these comments constituted an improper appeal to the passions and prejudices of the jury. However, we agree with the Commonwealth that these statements "exhibited oratorical flair supported by the evidence that [Crump] was shot in the head ten times" over a dispute regarding the proceeds from the sale of a stolen game system. Commonwealth's Brief at 57; **see also Tedford**, 960 A.2d at 33. They do not, contrary to Anderson's allegations, constitute prosecutorial misconduct and Anderson has therefore not met his burden of showing counsel was ineffective for failing to object.

Third, Anderson claims that the prosecutor misstated the evidence when he argued to the jury that "Well, yeah James Thompson is down at Homicide because Quil Banga gives him information that [Anderson] has a .22. Huh, how about that link." N.T., 10/15/14, at 72-73. We agree with Anderson that the prosecutor's statement is not supported by the record. However, Anderson has not shown that the unavoidable effect of this statement was to prejudice the jury by forming in their minds a fixed bias and hostility toward Anderson, thus impeding their ability to weigh the evidence objectively. **See Tedford**, 960 A.2d at 33. This is especially true in light of the fact that the trial court

specifically instructed the jury twice that the statements made by counsel are not evidence. **See** N.T. Trial, 10/6/14, at 136; N.T. Trial, 10/15/14, at 100; **Simmons**, 662 A.2d at 639-640. As such, Anderson has failed to show that this claim has arguable merit, and therefore that counsel's failure to object to this statement amounted to ineffective assistance.[10]

We also do not agree with Anderson that counsel was ineffective for failing to object to the prosecutor's statement that Anderson and Crump had been fighting since the Friday or Saturday before the murder. While the Commonwealth concedes there was no testimony at trial supporting the prosecutor's assertion in this regard, we note that Thompson did testify that Anderson had told him he was angry at Crump for stealing the game system without him and acting stingy. **See** N.T. Trial, 10/10/14, at 92-93. As such, we agree with the Commonwealth that the "misstatement was minor, and any prejudice [was] cured by the court's instruction to the jury that the attorney[s'] arguments are not evidence. **Simmons**, 662 A.2d at 639-40." Commonwealth's Brief at 59. Moreover, Anderson does not allege that the prosecutor deliberately misrepresented the testimony, nor does a review of

---

[10] Anderson also summarily asserts that the prosecutor's statement was an attempt to divert the jury's attention away from the fact that Thompson went to the police station intoxicated and with the intent to lie. Anderson does not explain or develop this bald assertion any further, and it is consequently waived. **See Commonwealth v. Treiber**, 121 A.3d 435, 467 (Pa. 2015) (stating that ineffectiveness claims that are not properly developed are waived).

the record show evidence of such intent. **See Simmons,** 662 A.2d at 639-640 (holding that prosecutor's misstatement of testimony was not prosecutorial misconduct when there was no evidence the misstatement was deliberate). Therefore, Anderson has failed to show counsel was ineffective.

The final prosecutorial statement Anderson claims counsel was ineffective for failing to object to is the statement "That's when the body is found. James Thompson, I don't know what time it was, 3:30, 4:30. It was somewhere around there. He called his parents. You know he called his parents. Finally, they're like, Where are you? That's how come he knows what time it was." N.T. Trial, 10/15/14, at 77-78. Anderson argues this statement was improper because Thompson did not testify that he called his parents that morning. As the Commonwealth notes, however, this statement was likely a mix-up with Anderson's statement that his parents called him around three a.m. to come home. Indeed, Anderson does not allege, nor does the record reflect, that the misstatement was deliberate. We agree with the Commonwealth that this was an unintentional and minor inconsistency, and any prejudice was cured by the court's jury instructions, given twice, that the attorney's comments are not evidence. **See Simmons**, 662 A.2d at 639-40. Therefore, this particular claim also does not support a finding that counsel was ineffective.

In the end, we see no error in the PCRA court's conclusion that none of these instances of alleged prosecutorial misconduct provide a basis of relief

for Anderson. He has not shown that counsel was ineffective for failing to object to any of these statements, either because the comments were proper responses to defense counsel's arguments, represented oratorical flair supported by the evidence, or were factual misstatements with any resulting prejudice being cured by the court's specific instruction that the attorneys' arguments are not evidence. No relief is due.

In his fourth claim, Anderson takes issue with counsel's actions regarding the diminished capacity/intoxication charge given by the court. Anderson acknowledges that counsel asked for a diminished capacity/intoxication charge based on the evidence that Anderson smoked marijuana on the day of the murder, and the court gave such a charge. *See* N.T. Trial, 10/15/14, at 120-121, 123. He contends, however, that counsel should have also requested that the charge include the fact that Anderson "drank" on the day of the murder. In support of this contention, Anderson points to his second statement to police in which he claimed that he and Crump "smoke and drank" all day prior to the murder. He proposes that "drank" could possibly mean that he took some type of oral medication, and speculates that a toxicology report of Crump could support this.[11] In the alternative, he argues that "drank" refers to alcohol consumption. Either way,

_____

[11] We note that the record does include a toxicology report performed on Crump. However, Anderson in no way makes any meaningful effort to tie that toxicology report to his claim here.

he summarily asserts that counsel should have requested that the diminished capacity/intoxication charge include a reference that he had also "drank" on the day of the murder. This claim is meritless.

A diminished capacity instruction due to voluntary intoxication is only warranted where the record contains evidence that the defendant was intoxicated to the point of losing his faculties or sensibilities. ***See Commonwealth v. Padilla***, 80 A.3d 1238, 1263 (Pa. 2013). Evidence that a defendant merely ingested alcohol or drugs, without more, does not warrant a voluntary intoxication instruction. ***See id.***

Here, we agree with the PCRA court's conclusion that Anderson has not demonstrated that counsel was ineffective as it relates to his request for a diminished capacity instruction. As the Commonwealth aptly explains:

> The court instructed the jury on diminished capacity because there was evidence that [Anderson] smoked marijuana. The only evidence that [Anderson] drank alcohol is a passing reference in his confession. Moreover, there was no evidence that [Anderson] was intoxicated to the point of losing his faculties or sensibilities.

Commonwealth's Brief at 62 (citations to notes of testimony omitted).

As such, it is questionable whether Anderson has shown that he was entitled to any diminished capacity instruction, though the court granted counsel's request and gave one as it related to Anderson's marijuana use. In any event, because the record does not contain evidence that would warrant the giving of a diminished capacity instruction for use of an unidentified oral medication or alcohol, Anderson has failed to demonstrate that counsel was

ineffective for requesting a diminished capacity instruction that included the ingestion of those substances. No relief is due.

In his final claim, Anderson argues that counsel breached his duty of loyalty to Anderson, and labored under a conflict of interest, because counsel did not, according to Anderson, believe Anderson's version of the events surrounding Crump's murder. In support of this assertion, he points to excerpts from counsel's letter urging him to take the plea as well as to statements made by counsel during trial and his opening argument. He appears to allege that all of the above ineffectiveness claims are a result of counsel's hostility towards him and his subsequent breach of loyalty, and that he is therefore entitled to relief based on the cumulative prejudice emanating from those claims. This claim is also without any merit.

The duty of loyalty is the obligation of counsel to avoid actual conflicts of interest that would adversely affect counsel's ability to perform on behalf of their client. *See Commonwealth v. Washington*, 880 A.2d 536, 543 (Pa. 2005). To establish a breach of this duty, the client must show there was an actual conflict of interest and that the conflict adversely affected the outcome of the client's case. *See id.* When a client claims that counsel was ineffective because personal animosity caused a conflict of interest, the client must show a direct correlation between the animosity and the deprivation of his right to a fair trial. *See id.* at 545. At the same time, counsel's strict belief in a client's

innocence is not a requisite of effective representation. *See Commonwealth v. Gardner,* 378 A.2d 465, 469 (Pa. Super. 1977).

Anderson first argues that counsel's letter, referenced in detail above, demonstrates that counsel breached his duty of loyalty to him. We agree with the PCRA court that this is simply not the case. Rather, it is clear that counsel "wrote the letter to give [Anderson] a realistic outlook of his trial prospects, not as proof of abandoning his client." PCRA court opinion, 10/22/20, at 26. The reality outlined by counsel was that, in light of the extensive evidence the Commonwealth had against Anderson, it was counsel's belief that Anderson would be convicted of first-degree murder if he went to trial. Counsel made clear in this letter that he was actually looking out for Anderson's interests by recommending that he take the plea to avoid a first-degree murder conviction.

Anderson complains, however, that the letter demonstrated counsel had a conflict of interest and did not believe his side of the story given that the letter documented that the murder weapon had been found in his freezer, Anderson had spoken to police against counsel's advice, and that he was the last person to be seen with Crump. Of course, as both the Commonwealth and the PCRA court point out, counsel's letter was merely reciting the evidence the Commonwealth had to support its prosecution of Anderson for first-degree murder. In any event, even if counsel "actively believed" that Anderson confessed to and was guilty of the murder, as Anderson maintains, "[c]ounsel does not have to believe in their client's innocence to effectively represent

him, so absent a demonstration of how this belief directly affected the outcome of trial, counsel did not breach his duty of loyalty." Commonwealth's Brief at 65 (*citing **Washington*** 880 A.2d at 545; ***Gardner***, 378 A.2d at 469).

In the same vein, Anderson complains that counsel's statements during trial that Anderson stayed home on the night of August 19, 2013, rather than going to Farrell's house with the rest of the group, represented a breach of loyalty because it contradicted the record and his version of events. Again, Anderson has not shown that counsel made these statements out of hostility towards him or out of any conflict of interest, or that the statements served to deprive him of a fair trial. ***See Washington***, 880 A.2d at 545.

Anderson also insists that counsel acted contrary to his interests when he stated in his opening remarks that "If what was just said [by the prosecutor in her opening remarks, outlining all of the evidence the Commonwealth had against Anderson] was the situation, we don't even need a trial. We just need a noose." N.T. Trial, 10/8/14, at 146. However, Anderson neglects to put this statement in context. After he made that statement, defense counsel continued:

> This defendant suffered a tremendous loss when his friend was killed. They were friends a long time. They were really good friends. And so much so that when the deceased, Daquan Crump, needed a place to live, he brought him in.

***Id.***

As the Commonwealth explains, "[c]ounsel made [the challenged] statement in the context of setting up the defense theory that [Anderson] had

no motive to desire the death of [Crump] because they were best friends. In this instance, [the challenged] statement was not prejudicial." Commonwealth's Brief at 65.

We agree, and conclude that Anderson has not shown that this statement demonstrates counsel was hostile towards him or was laboring under a conflict of interest, nor has he shown that the statement deprived him of a fair trial. **See Washington**, 880 A.2d at 545. We also note that to the extent Anderson makes the overarching claim that all of the ineffectiveness claims he presents in this appeal stemmed from counsel's hostility towards him or some other conflict of interest, and that he is therefore entitled to relief based on the cumulative effect of all of those claims, we reject this claim. "No number of failed claims may collectively warrant relief if they fail to do so individually." **Tedford**, 960 A.2d at 56 (citations omitted). While we agree with Anderson that his first claim merits relief, we have given him relief based on that one meritorious claim. The rest of his ineffectiveness claims do not warrant relief, individually or cumulatively.

In sum, we conclude that Anderson is entitled to an evidentiary hearing on his claim that counsel was ineffective for failing to file a motion to suppress the evidence derived from his initial, unconstitutionally-obtained statement to police. We therefore reverse the portion of the PCRA court order denying that claim without a hearing. We also agree with the PCRA court that the remainder

of Anderson's ineffectiveness claims lack merit, and affirm that portion of its order dismissing those claims without a hearing.

Order reversed in part, and affirmed in part. Matter remanded to the PCRA court to hold a hearing, limited to Anderson's claim that counsel was ineffective for failing to file a motion to suppress the evidence derived from Anderson's initial statement to police. Jurisdiction relinquished.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 1/28/2022